**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SERGEANTS BENEVOLENT ASSOCIATION HEALTH AND WELFARE FUND, individually and on behalf of all others similarly situated, | Case No. 17-cv-00980-JSR |
| Plaintiff, | |
| v. | |
| ACTAVIS ELIZABETH, LLC, ET AL. | |
| Defendants. | |
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 37 HEALTH & SECURITY PLAN, individually and on behalf of all others similarly situated, | Case No. 17-cv-01039-JSR |
| Plaintiff, | |
| v. | |
| ACTAVIS ELIZABETH, LLC, ET AL. | |
| Defendants. | |

## END-PAYOR PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

### JURY TRIAL DEMANDED

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ............................................................. 4

III.   THE PARTIES.................................................................................... 6

     A.    Plaintiffs ................................................................................ 6

     B.    Defendants ............................................................................ 7

     C.    Agents and Co-Conspirators ............................................... 10

IV.   FACTUAL ALLEGATIONS ................................................................ 11

     A.    The Structure of the Generic Propranolol Market Facilitated Defendants' Collusion ................................................................................ 11

     B.    Defendants Increase Prices of Generic Propranolol Significantly Above Competitive Levels ............................................................ 13

     C.    Factors Corroborating Defendants' Horizontal Price-Fixing Agreement............ 23

     D.    Absent an Anticompetitive Conspiracy, Propranolol Price Increases Would Have Run Contrary to Each Defendant's Self-Interest ........................... 41

     E.    Defendants Are Under Civil and Criminal Investigation for Price-Fixing Generic Drugs ........................................................................ 42

V.    CLASS ACTION ALLEGATIONS ...................................................... 45

FIRST CLAIM FOR RELIEF  VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1 (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE INJUNCTIVE RELIEF CLASS AGAINST ALL DEFENDANTS)....................................................... 49

SECOND CLAIM FOR RELIEF  VIOLATION OF STATE ANTITRUST LAWS (ON BEHALF OF PLAINTIFFS AND THE DAMAGES CLASS AGAINST ALL DEFENDANTS)............................................................................... 51

THIRD CLAIM FOR RELIEF  VIOLATION OF STATE CONSUMER PROTECTION STATUTES (ON BEHALF OF PLAINTIFFS AND THE DAMAGES CLASS AGAINST ALL DEFENDANTS)................................................................ 75

FOURTH CLAIM FOR RELIEF  UNJUST ENRICHMENT (ON BEHALF OF PLAINTIFFS AND THE DAMAGES CLASS AGAINST ALL DEFENDANTS)....... 91

VI.   PRAYER FOR RELIEF ................................................................... 91

VII.  JURY DEMAND ............................................................................ 92

1339968.9

American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan and Sergeants Benevolent Association Health & Welfare Fund (collectively, "Plaintiffs") individually and on behalf of others similarly situated, allege a conspiracy among Defendants Actavis Elizabeth, LLC; Teva Pharmaceuticals USA, Inc.; Pliva, Inc.; Mylan Inc.; Mylan Pharmaceuticals Inc.; UDL Laboratories, Inc.; Par Pharmaceutical Inc.; Qualitest Pharmaceuticals, Inc.; Heritage Pharmaceuticals Inc.; Breckenridge Pharmaceutical, Inc.; and Upsher-Smith Laboratories, Inc. (collectively "Defendants"), to increase the prices of generic propranolol.

## I.    SUMMARY OF THE ACTION

1.    This is a civil antitrust action brought by indirect purchasers of the capsule and tablet formulations of the prescription drug propranolol hydrochloride.[1] Propranolol is used to treat tremors, angina (chest pain), hypertension (high blood pressure), heart rhythm disorders, and other heart or circulatory conditions.  It is also used to treat or prevent heart attacks, and to reduce the severity and frequency of migraine headaches.  It is reportedly the highest-selling beta-blocker as measured by prescriptions.  Plaintiffs bring this action individually and on behalf of proposed classes seeking (a) overcharge damages and (b) equitable and injunctive relief arising out of Defendants' conspiracy to raise, fix, and stabilize the prices of propranolol capsules from March 2013 through the present and propranolol tablets from December 2014 through the present.

2.    For decades, generic drug manufacturers competed to provide safe, effective, and inexpensive alternatives to brand name drugs.  The result was vigorous competition, modest profit margins, and prices that tracked manufacturer costs and patient demand.  Patients and

---

[1] Unless specified otherwise, the term "propranolol" as used herein refers to both propranolol extended release (or "ER") capsules and tablets, but not any other formulations of propranolol hydrochloride.

others in the pharmaceutical supply chain benefited from competition and low prices.  The markets for propranolol are no exception, and competition among generic propranolol manufacturers had kept propranolol prices low for years.  But between March and November 2013, prices for propranolol capsules—which are sold by Actavis, Breckenridge, and Upsher-Smith—abruptly increased by an average of 80% and continued to rise thereafter.  Similarly, beginning in December 2014, the average prices for propranolol tablets—which are sold by Actavis, Heritage, Mylan, Par, and Teva—began increasing abruptly; by May 2015, prices had increased by over 350% on average.  By September 23, 2015, propranolol tablet prices had increased by 860% from previously stable levels.  Defendants' propranolol price increases were not the product of unilateral business decisions, but resulted instead from agreements to fix prices.

3.      The propranolol markets were highly conducive to collusion.  They were controlled almost entirely by Defendants and are subject to high barriers to entry.  Propranolol is a medically necessary product for which reasonable substitutes are not available and demand is inelastic.  Federal regulations require Defendants' propranolol products to contain the same type and amount of active pharmaceutical ingredient and to be therapeutically equivalent to one another.  They are therefore interchangeable commodity products.  Interchangeability facilitates collusion, as cartel members can easily monitor and detect deviations from a price-fixing agreement.  And because purchasers choose whose propranolol product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same.

1339968.9

4.     The inexplicable and skyrocketing prices of generic drugs has led to several government investigations, including by the Antitrust Division of the United States Department of Justice ("DOJ"), the United States Senate, the United States House of Representatives, and at least twenty States.[2]  Many generic drug companies, including Defendants Actavis, Teva, Mylan, Par, and Heritage, have received federal grand jury subpoenas.  Mylan received subpoenas from the DOJ seeking pricing and other information regarding its propranolol products in particular.

5.     On December 14, 2016, the DOJ brought felony charges against Jeffrey Glazer and Jason Malek—former senior generic pharmaceutical executives from Defendant Heritage— for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs.  On January 9, 2017, Glazer and Malek pled guilty to felony charges.  The DOJ's charges are the result of an ongoing DOJ investigation into price fixing, bid rigging, and other anticompetitive conduct in the generic pharmaceutical industry.

6.     On December 14, 2016, twenty States filed a civil case against six generic drug manufacturers, including Defendants Heritage, Teva, and Mylan.  The States allege that their investigation, which began in July 2014 and "is still ongoing," "uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States."

7.     The attorneys general complaint explains that in 2013 and 2014, former Heritage executives Malek and Glazer compiled a large list of generic drugs for which Heritage intended to work with its competitors to increase prices and allocate customers.  The complaint details

---

[2]  The States include Connecticut, Delaware, Florida, Hawaii, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Nevada, New York, North Dakota, Ohio, Pennsylvania, Virginia, and Washington.

1339968.9

specific efforts made by Malek and other Heritage employees to contact Defendants Teva and Mylan regarding price increases and the allocation of customers.

8.    Defendants' conspiracy restrained trade and is *per se* unlawful under federal and state law.  As alleged below, Defendants' scheme injured Plaintiffs and the Classes of indirect purchasers they seek to represent causing them to overpay for generic propranolol.  Plaintiffs seek to recover these overcharges and seek other relief arising out of Defendants' conspiracy to fix the prices of: (1) propranolol capsules during the period from March 2013 to the present ("Capsules Class Period"), and (2) for propranolol tablets during the period from December 2014 to the present ("Tablets Class Period") (both class periods are referred to collectively as the "Class Periods").

## II.    <u>JURISDICTION AND VENUE</u>

9.    Plaintiffs bring this action to obtain injunctive and declaratory relief, as well as costs of suit and attorneys' fees, arising from Defendants' violations of the Sherman Act, 15 U.S.C. § 1.  Plaintiffs also seek injunctive and declaratory relief, costs of suit and attorneys' fees, and damages, arising from Defendants' violations of state laws, pursuant to Plaintiffs' second, third, and fourth claims for relief, as set forth below.

10.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, and 1367.  This Court also has jurisdiction pursuant to 15 U.S.C. § 26.

11.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq.*, which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.  The $5 million amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

12. This Court has personal jurisdiction over Defendants pursuant to the Clayton Act, 15 U.S.C. § 22, and the New York long-arm statute, N.Y. C.P.L.R. § 302, because Defendants transact substantial business within the state of New York, including in this district, and Defendants' conspiracy has injured at least many thousands of New York citizens who have overpaid for necessary medications, including in this district.  Defendants regularly conduct and solicit business in New York, including in this district, derive substantial revenue from products that are used and consumed in New York, including in this district, and derive substantial revenue from interstate commerce.

13. Venue is proper under the Clayton Act because Defendants knowingly transact a large volume of business in New York in the form of sales of pharmaceuticals, including generic propranolol.  15 U.S.C. § 22.

14. Venue is also appropriate in this district under 28 U.S.C. § 1391(b) and (c). During the Class Periods, Defendants transacted business, were found, or had agents in this district and because a significant amount of affected interstate trade and commerce was carried out in this district.

15. The activities of the Defendants were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.  Defendants' products are sold in the flow of interstate commerce.

16. By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes (as defined below).  Defendants, directly and through their agents, engaged in a conspiracy affecting all states to fix and inflate prices of generic propranolol, which unreasonably restrained trade and adversely affected the market for generic propranolol.

III.    **THE PARTIES**

    A.    **Plaintiffs**

    17.    Plaintiff American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan ("DC 37") is a health and welfare benefit plan covering public sector employees, retirees and their families. Its principal place of business is in New York, New York. District Council 37 ("the Union") is New York City's largest public employee union. DC 37's health and welfare benefit plan covers approximately 125,000 active union members as well as 50,000 retirees and their families. The Union includes 51 local unions, representing public sector employees serving in thousands of job titles from Accountants to Zoo Keepers. Members covered by DC 37's benefit plan work in almost every agency in New York City including but not limited to the City's police and fire departments, hospitals, schools, libraries, social service centers, water treatment facilities, and city colleges. DC 37 provides supplemental health benefits, including a prescription drug benefit to its members, retirees, and their families. Throughout the Class Periods and throughout the United States, DC 37 indirectly purchased, paid, and reimbursed for generic propranolol intended for consumption by its members, retirees, and their families, including but not limited to, in Alabama, Arizona, California, Florida, Hawaii, Illinois, Iowa, Kansas, Nevada, New York, North Carolina, Rhode Island, and South Carolina. During the Class Periods, DC 37 purchased, paid, and reimbursed for capsules purchased in New York manufactured by each of Actavis, Breckenridge, and Upsher-Smith, and purchased, paid, and reimbursed for tablets purchased in New York manufactured by each of Actavis, Heritage, Mylan, Par, and Teva. Given its plan members' past purchases of propranolol, DC 37 anticipates that it will continue to purchase and/or provide reimbursement for propranolol in the future.

1339968.9

18.     Plaintiff Sergeants Benevolent Association Health & Welfare Fund is located in New York and provides health and prescription drug benefits to active and retired New York City Police Department Sergeants and their dependents.  Throughout the Class Periods and throughout the United States, Sergeants indirectly purchased, paid, and reimbursed for generic propranolol intended for consumption by its members, retirees, and their families, including but not limited to, in Arizona, California, Florida, Illinois, Kansas, Maine, Nevada, New Hampshire, New York, North Carolina, South Carolina, Utah, and Vermont.  During the Class Periods, Sergeants purchased, paid, and reimbursed for capsules purchased in New York manufactured by each of Actavis, Breckenridge, and Upsher-Smith, and purchased, paid, and reimbursed for tablets purchased in New York manufactured by each of Actavis, Heritage, Mylan, Par, and Teva.  Given its plan members' past purchases of propranolol, Sergeants anticipates that it will continue to purchase and/or provide reimbursement for propranolol in the future.

**B.**     **Defendants**

19.     Defendant Actavis Elizabeth, LLC ("Actavis") is a Delaware limited liability company with its principal place of business at 200 Elmora Ave., Elizabeth, New Jersey 07207. In 2012, Watson Pharmaceuticals acquired then-Switzerland-based Actavis Group to form Actavis plc, later known as Allergan plc after Actavis plc acquired Allergan Inc. in 2015.  In August 2016, Teva Pharmaceutical Industries Ltd. acquired Allergan plc's generic pharmaceutical business for $40.5 billion.  Actavis was among the Allergan plc generic pharmaceutical entities acquired by Teva in 2016.  During the Class Periods, Actavis marketed and sold generic propranolol capsules and tablets in this District and throughout the United States.

20.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business at 1090 Horsham Road, North Wales,

Pennsylvania 19454.  During the Tablets Class Period, Teva USA marketed and sold generic propranolol tablets in this District and throughout the United States.

21.    Defendant Pliva, Inc. ("Pliva") is a New Jersey corporation with its principal place of business at 72 Deforest Ave. East Hanover, New Jersey 07936.  Pliva is a subsidiary of Teva Pharmaceutical Industries, Ltd.  During the Class Periods, Pliva sold generic propranolol tablets to customers in this District and other locations in the United States.

22.    Defendants Teva Pharmaceuticals USA, Inc. and Pliva, Inc. are referred to collectively as "Teva."

23.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business at 1000 Mylan Blvd., Canonsburg, Pennsylvania 15317.  The parent corporation of Mylan Inc. is Mylan N.V., a Netherlands corporation with global headquarters in Hertfordshire, U.K., and in Canonsburg, Pennsylvania.  During the Class Periods, Mylan Inc. marketed and sold generic propranolol capsules and tablets in this District and throughout the United States through its subsidiaries, Mylan Pharmaceuticals Inc. and UDL Laboratories, Inc.

24.    Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505. During the Class Periods, Mylan Pharmaceuticals Inc. marketed and sold generic propranolol capsules and tablets in this District and throughout the United States.

25.    Defendant UDL Laboratories, Inc. ("UDL") is an Illinois corporation with its principal place of business at 1718 Northrock Ct, Rockford, Illinois 61103.  UDL is, and was throughout the Class Period, a subsidiary of Mylan Inc.  During the Tablets Class Period, UDL marketed and sold generic propranolol tablets in this District and throughout the United States.

-8-

26.     Defendants Mylan Inc., Mylan Pharmaceuticals Inc. and UDL are referred to collectively as "Mylan."  Mylan maintains an office at 405 Lexington Avenue, New York, New York 10174.

27.     Defendant Par Pharmaceutical, Inc. ("Par"), is a New York corporation with its principal place of business in Chestnut Ridge, New York.  In September 2015, Endo International PLC ("Endo International"), an Irish corporation with its principal place of business located in Dublin, Ireland, completed an acquisition of Par at which time it combined its Par and Qualitest business units, naming the segment "Par Pharmaceutical, an Endo International Company."

28.     Defendant Qualitest Pharmaceuticals, Inc. ("Qualitest") is an Alabama corporation with its principal place of business in Huntsville, Alabama.  In 2010, Endo International acquired Qualitest.  During the Tablets Class Period, Qualitest marketed and sold generic propranolol tablets in this District and throughout the United States.

29.     Defendant Heritage Pharmaceuticals Inc. ("Heritage") is a Delaware corporation with its principal place of business at 12 Christopher Way #300, Eatontown, New Jersey 07724. During the Tablets Class Period, Heritage marketed and sold generic propranolol tablets in this District and throughout the United States.  Heritage is a subsidiary of Emcure Pharmaceuticals Ltd., based in Pune, India.  Defendant Heritage is registered to do business in New York and does business in this District.

30.     Defendant Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Delaware corporation with its principal place of business at 1 Passaic Ave, Fairfield, New Jersey 07004. During the Capsules Class Period, Breckenridge marketed and sold generic propranolol capsules in this District and throughout the United States.

31.    Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith") is a Minnesota corporation with its principal place of business at 6701 Evenstad Drive, Maple Grove, Minnesota 55369.  During the Capsules Class Period, Upsher-Smith marketed and sold generic propranolol capsules in this District and throughout the United States, and has a sales person responsible for sales in New York, Amanda Strow, CNS Account Sales Manager.  Upsher-Smith representatives regularly attended trade association events in New York during the Capsules Class Period.  For example, Scott Hussey, Senior Vice President, Sales, and Jim Maahs, Vice President, Commercial Portfolio Management, attended the NACDS annual NYC week and annual foundation dinner in New York City in December 2013, 2014, and 2015.  Brad Leonard, Senior Director, National Accounts, attended the 2015 NACDS annual NYC Week and annual foundation dinner in New York in 2015.

### C.    Agents and Co-Conspirators

32.    Defendants' officers, directors, agents, employees, or representatives engaged in the conduct alleged in this Complaint in the usual management, direction, or control of Defendants' business or affairs.

33.    Each of the Defendants acted as the agent of, co-conspirator with, or joint venture partner of the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged in this Complaint.

34.    Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, and individuals, both known and unknown, participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and performed acts and made statements in furtherance of the conspiracy.  Plaintiffs reserve the right to name some or all of these persons and entities as defendants at a later date.

1339968.9

IV.    **FACTUAL ALLEGATIONS**

   A.    **The Structure of the Generic Propranolol Market Facilitated Defendants' Collusion**

35.    Defendants manufacture, market, and sell generic versions of branded drugs including generic propranolol, among other products.

36.    Generic drug manufacturers such as Defendants can only obtain FDA approval to sell their generic drug products after the patent on the corresponding branded drug expires. According to the FDA, a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."  Once the FDA approves a generic drug as "therapeutically equivalent" to a brand name drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."

37.    The purpose of authorizing a generic drug industry in the United States was to encourage the manufacture of less expensive, non-branded substitutes for branded prescription drugs that either had no patent exclusivity or for which the patent exclusivity was expiring. Once the patent on a brand-name drug expires, generic manufacturers can enter the market, increasing competition, which results in lower prices.  In a January 2012 report, the United States Government Accountability Office noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."  Economic literature in the healthcare market further confirms that competition by generic products results in lower prices for consumers.  In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price without the impact of competitive market forces.  Once the first generic enters the market, however, a brand drug rapidly loses sales, on average 90% within a year.  As more generic manufacturers enter the market, prices for generic versions of a drug predictably will continue to decrease because of

competition among the generic manufacturers, and the loss of sales volume by the brand drug to the corresponding generic accelerates as more generic options are available to purchasers.

38.     Due to the sizable price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists usually substitute the generic drug when presented with a prescription for the branded drug.  Since passage of the Hatch-Waxman Act (Pub. L. No. 98-417, 98 Stat. 1585 (codified at 15 U.S.C. §§ 355, 360cc; 35 U.S.C. §§ 156, 271)), every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

39.     According to a report by the Generic Pharmaceutical Association ("GPhA"), nearly 3.8 billion (88%) of the total 4.3 billion prescriptions dispensed in the U.S. in 2014 were filled using generic drugs.

40.     A mature generic market, such as the market for propranolol, has several generic competitors.  Due to the fact that each generic is readily substitutable for another generic of the same brand drug, the products behave like commodities, with pricing being the main differentiating feature and the basis for competition among manufacturers.  Over time, generics' pricing nears the generic manufacturers' marginal costs.

41.     Generic competition usually enables buyers to purchase generic versions of the brand drug at a substantially lower price than the brand drug.  Generic competition to a single blockbuster brand drug product can result in billions of dollars in savings to consumers, insurers, local, state, and federal governments, and others.  The use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.

**B.**    **Defendants Increase Prices of Generic Propranolol Significantly Above Competitive Levels**

42.    Beginning in approximately 2013 and continuing to the present, Defendants formed and maintained a price-fixing cartel that included their generic propranolol capsule and tablet products.  Senior executives of each Defendant reached agreement and monitored compliance.  Defendants' anticompetitive agreements resulted in dramatic price increases for their generic propranolol capsule and tablet products.  The price increases began shortly after the Defendants attended meetings of the Generic Pharmaceutical Association ("GPhA") in February 2013 (for capsules) and after a National Association of Chain Drug Stores ("NACDS") meeting in December 2014 (for tablets).  The GPhA describes itself as the "leading trade association for generic drug manufacturers and distributors, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  According to its website, the NACDS is a trade organization whose mission "is to advance the interests and objectives of the chain community pharmacy industry by fostering its growth and promoting its role as a provider of healthcare services and consumer products."

1339968.9

43.     As the following chart (based on National Average Drug Acquisition Cost, or NADAC, data[3]) indicates, prices for generic propranolol capsules increased significantly in 2013. Prices appear to reflect a "one-way ratchet": prices never decreased substantially, as one would expect if sudden price increases reflected temporary supply shortages, cost increases, or other benign market factors.



_____

[3] According to the Centers for Medicare and Medicaid Services (CMS), NADAC data is based on a regularly-updated survey that "collects acquisition costs for covered outpatient drugs purchased by retail community pharmacies, which include invoice purchase prices from independent and chain retail community pharmacies." Pharmacies included in the survey are from all fifty states and the District of Columbia. CMS has explained that "NADAC is designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription and over-the-counter covered outpatient drugs."

1339968.9

44.     Similarly, as the following chart based on NADAC data indicates, prices for generic propranolol tablets increased significantly starting in 2015.  These prices, too, reflected a one-way ratchet, and did not decrease substantially as would be expected if the increases had a benign market explanation.



45.     Data showing Medicaid reimbursements—which are the amounts that Medicaid has paid to cover its beneficiaries' prescription drug purchases—provides prices by manufacturer and confirms that Defendants increased their prices in very similar fashion over time for both propranolol capsules and tablets.

**A.     Extended Release Capsules**

46.     Defendants Actavis, Breckenridge, and Upsher-Smith have been the primary sellers of propranolol capsules and increased their prices by similar amounts at similar times.

47.     For the two and a half years before the capsules conspiracy began, transaction prices for propranolol capsules were only 57 cents per capsule on average and were at times as

-15-

low as 44 cents per capsule. After Defendants agreed to raise and fix prices, the average price

doubled, regularly reaching more than $1 per capsule, and often $1.43 per capsule. The average

capsule price charged by certain Defendants reached as high as over $1.70 per capsule, over a

350% increase in price.

48.    The following charts display the per-unit amounts that Medicaid has reimbursed

for its beneficiaries' purchases of Defendants' generic propranolol capsule products:

### 1.    60 mg Capsules – 100 Capsule Bottle



### 2.    80 mg Capsules – 100 Capsule Bottle



### 3.    120 mg Capsules – 100 Capsule Bottle



1339968.9

### 4.  160 mg Capsules – 100 Capsule Bottle



#### B.  Tablets

49.    Defendants Actavis, Heritage, Mylan, Par, and Teva have been the primary sellers of propranolol tablets and increased their prices by similar amounts at similar times.

50.    In the four years before the tablets conspiracy began, transaction prices for propranolol tablets remained under 4 cents per pill on average, sometimes reaching as low as 3 cents per pill on average.  After the conspiracy started, the average price was regularly over 475% higher, reaching 19 cents per pill and even as high as 26 cents per pill, a 650% increase. During the conspiracy period, some Defendants charged almost 30 cents per pill on average across all dosage strengths of their tablet products.

51.    The following charts display the per-unit amounts that Medicaid has reimbursed for its beneficiaries' purchases of Defendants' generic propranolol capsule tablets:

-18-

1.      **10 mg Tablets**

a.      **100 Tablet Bottle**



b.      **1000 Tablet Bottle**



## 2.    20 mg Tablets

### a.    100 Tablet Bottle



### b.    1000 Tablet Bottle



3.    40 mg Tablets

a.    100 Tablet Bottle



b.    1000 Tablet Bottle



### 4.  <u>60 mg Tablets</u>

#### a.  **100 Tablet Bottle**



PROPRANOLOL: Avg. Reimb. per Unit (TAB60MG--100)

### 5.  <u>80 mg Tablets</u>

#### a.  **100 Tablet Bottle**



PROPRANOLOL: Avg. Reimb. per Unit (TAB80MG--100)

1339968.9

**b.    100 Tablet Bottle**



PROPRANOLOL: Avg. Reimb. per Unit (TAB80MG--500)

52.    Medicaid reimbursement rates are typically the average wholesale price (AWP) minus a pre-determined percentage or the wholesale acquisition cost (WAC) plus a pre-determined percentage.  Elevated Medicaid reimbursement rates, therefore, reflect elevated AWP and/or WAC prices.  Both AWP and WAC are list prices for prescription drugs used throughout the pharmaceutical industry.  WAC and AWP serve as pricing benchmarks for Medicaid and across the pharmaceutical industry.  Increased WAC and AWP result in elevated retail prices paid by end-payors, including Plaintiffs and members of the proposed classes.

**C.    Factors Corroborating Defendants' Horizontal Price-Fixing Agreement**

53.    In addition to the pricing data set forth above, several market and other relevant factors support the conclusion that Defendants acted to unlawfully raise and fix propranolol prices far above competitive levels.  The market for propranolol in the United States is characterized by several factors that facilitated Defendants' conspiracy in restraint of trade,

including: (1) market concentration among a limited number of participants; (2) high barriers to entry; (3) mutual interchangeability of Defendants' products; (4) inelasticity of demand and lack of available substitutes; and (5) opportunities for Defendants to conspire.

### 1.    Market Concentration

54.    Market concentration facilitates collusion among participants.  If many companies sell the same product, companies that are not part of the conspiracy can erode cartel members' market shares by offering products at lower, more competitive prices, undercutting the cartel.

55.    The market for both formulations of propranolol is highly concentrated. Together, Defendants Actavis, Upsher-Smith, and Breckenridge controlled nearly the entire market for propranolol capsules as of February 2013, accounting for 80% or more of the market (Actavis, approximately 50%; Upsher, approximately 30%; and Breckenridge approximately 1%).  Shortly after February 2013, the market share for Mylan—who is not a defendant with respect to capsules but had actively sold capsules prior to the February 2013 price increases— significantly declined and Breckenridge's market share grew considerably and reached 30% by November 2013.  Similarly, Defendants Actavis, Mylan, Teva, Qualitest/Par and Heritage controlled nearly the entire market for propranolol tablets as of November 2014, accounting for approximately 90% of the market (Actavis, approximately 23%; Heritage, approximately 27%; Teva, approximately 30%; Mylan, approximately 3%; and Par/Qualitest, approximately 3%).

56.    Given the lack of competing manufacturers of propranolol, Defendants' concerted actions have had the ability to affect and have affected pricing in the United States.

### 2.    High Barriers to Entry

57.    Markets characterized by high barriers to entry are susceptible to anticompetitive price manipulation.

-24-

58.     Here, high barriers to entry in the market for generic drugs such as manufacturing costs, the need to conduct clinical testing, and regulatory oversight have prevented entry by propranolol manufacturers even though artificially high prices would normally attract market entrants.

59.     Despite the streamlining effect of the Hatch-Waxman Act, bringing a generic drug to market remains a costly and time consuming undertaking.  Through clinical testing, generic drug manufacturers are required to demonstrate to the FDA that their drug is bioequivalent to a reference listed drug.

60.     As a result of the substantial barriers to entry present in the generic drug market, it currently takes a median of 48 months for a generic drug to be approved.

61.     Economies of scale among incumbent generic manufacturers also render it difficult for new firms to enter the generic pharmaceutical market.  It is difficult for a new company to attempt to produce the same drug as larger, established firms—like Defendants— that already have well-established manufacturing infrastructures, distribution networks, and suppliers.

### 3.     Mutual Interchangeability of Defendants' Products

62.     When products offered by different firms are viewed by purchasers as interchangeable, the suppliers can more easily agree on a single price for the product in question, and effectively monitor pricing to enforce their agreement.  Thus, when a product is a commodity that is interchangeable with other products, conditions are ripe for an anticompetitive cartel.

63.     Generic drugs are by their nature interchangeable.  In order to obtain FDA approval as a generic drug, each manufacturer must show that the generic drug is bioequivalent to the branded drug.  In other words, the generic drug and branded drug must have the same

-25-

active ingredient and perform in the same manner. Each of the propranolol products manufactured by Defendants is a chemical compound composed of the same raw materials as the competing manufacturers' products. As such, the propranolol products manufactured by Defendants are interchangeable and reasonable substitutes for one another.

### 4. <u>Inelastic Demand</u>

64.     Where demand for a product is inelastic, increases in price cause only limited declines in the quantity of the product sold or consumed in the market. If a given change in price triggers a smaller proportionate change in the quantity demanded, then the demand for the good or service is said to be inelastic.

65.     For a cartel to profit from raising prices above competitive levels, demand must be inelastic such that cartel members are able to raise prices without triggering a decline in demand that would render the concerted price increase unprofitable. Demand is most likely to be inelastic where a product is necessary and other products are not substitutes. Both of these conditions are met with respect to propranolol.

66.     Propranolol is an important and medically necessary drug for millions of people. Left untreated, certain heart and circulatory conditions normally treated by propranolol can rapidly worsen and result in hospitalization, acute pain and discomfort, or death. Therefore, physicians and their patients regard propranolol as a medical necessity that must be purchased without regard to an increase in price. While other beta-blockers on the market seek to treat similar conditions, propranolol is often the only effective medicine that is reasonably available or medically suitable to patients.

67.     Propranolol is also differentiated from other drug products because of its regulatory status. A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the brand name version and other generic versions of that drug. Defendants'

propranolol products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar drug products. A patient prescribed propranolol could not, therefore, purchase a different drug using his or her propranolol prescription, regardless of the respective prices of the drugs. The next-best substitute for generic propranolol is branded propranolol, which costs significantly more than generic alternatives.

68. Propranolol is thus susceptible to collusive price fixing as price increases will directly translate into more revenue for cartel members, rather than less.

### 5.    Opportunities to Conspire

69. Defendants and their senior executives are active members of the GPhA. For example, a number of Defendants' high-ranking corporate officers served on GPhA's Board of Directors before and during the Class Periods:

a.    **2012 Board of Directors**: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Government and Public Affairs for Teva; Doug Boothe, President and CEO of Actavis; and Jeffrey Glazer, CEO of Heritage.

b.    **2013 Board of Directors**: Tony Mauro, President of Mylan North America; Debra Barrett, Sr. VP of Global Government Affairs and Public Policy for Teva; Jeffrey Glazer, President and CEO of Heritage; and Charlie Mayr, Chief Communications Officer at Actavis.

c.    **2014 Board of Directors**:  Jeffrey Glazer, CEO of Heritage; Tony Mauro, President of Mylan North America; and Allan Oberman, President and CEO of Teva Americas Generics.

d.    **2015 Board of Directors**: Debra Barrett, Sr. VP Global Government Affairs for Teva; Jeff Glazer, CEO of Heritage; Marcie McClintic Coates, VP & Head of

Global Regulatory Affairs for Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

e.  **2016 Board of Directors**: Debra Barrett, Sr. VP Global Government Affairs for Teva; Heather Bresch, CEO of Mylan; and Tony Pera, Chief Commercial Officer for Par Pharmaceuticals.

f.  The Capsule Defendants all attended either or both of the October 1-3 2012 Technical Conference in Bethesda Maryland and the February 20-22, 2013 Annual meeting in Orlando Florida.  The Tablet Defendants (and/or their corporate parents) attended the 2015 GPhA Annual Meeting in Miami, Florida between February 9 and 11, 2015.  These meetings provided additional "networking events," which presented opportunities for collusion through informal, off-premises events, such as golf tournaments, fly-fishing outings, and kayaking trips.

70.  Defendants also had opportunities to collude through their involvement in the National Association of Chain Drug Stores ("NACDS").  Membership in the NACDS is open to generic pharmaceutical manufacturers, and Defendants Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith were NACDS members from 2013 through 2016.  Members have access to custom industry research and industry publications, can participate in NACDS committees and workgroups, and attend various conferences.

71.  On April 20-23, 2013, NACDS held its Annual Meeting in Palm Beach, Florida. NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" attended by "senior management" in the pharmaceutical retailing and manufacturing industries.  Attendees are provided a list of participating companies in advance, and have access to private meeting rooms where executives can meet face-to-face.  And attendees can choose from a variety of business

-28-

programs, "invitation only" events, and social functions.  The following of Defendants'

representatives, among others, attended NACDS's 2013 Annual Meeting:

a.   **Defendant Actavis:** Paul Bisaro, Board Member; Andrew Boyer, President and

CEO of North America Generics; Michael Reed, Executive Director of Trade

Relations; Michael Baker, Executive VP of Trade Sales and Development; Paul

Reed, Sr. Director of Trade Sales and Development; and Robert Stewart, Chief

Operating Officer;

b.   **Defendant Mylan:** Joe Duda, President; Tony Mauro, Chief Commercial Officer;

Robert Potter, Sr. VP of North America National Accounts and Channel

Development; Jeffrey May, VP of North America Product Strategy; and Jim

Nesta, VP of Sales;

c.   **Defendant Par:** Paul Campanelli, President; Jon Holden, VP of Sales; Michael

Altamuro, VP of Marketing and Business Analytics; and Renee Kenney, Sr.

Advisor for Generic Sales;

d.   **Defendant Teva:** Jeremy Levin, President and CEO; Allan Oberman, President

and CEO of Teva Americas Generics; Maureen Cavanaugh, Sr. VP and Chief

Operating Officer of North America Generics; Teri Coward, Sr. Director Sales

and Trade Relations; Michael Sine, Director, Corporate Account Group; Jonathan

Kafer, Executive VP, Sales and Marketing; David Marshall, VP of Operations;

Dave Rekenthaler, VP of Sales; and

e.   **Defendant Upsher-Smith:** Mark Evenstad, CEO; Thomas Burke, Chief

Operating Officer; Brad Leonard, Sr. Director of National Accounts; Scott

Hussey, Sr. VP of Sales; Jim Maahs, VP of Commercial Portfolio Management; and Mike McBride, VP of Partner Relations.

72.    The next year, executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith attended the NACDS 2014 Annual Meeting held on April 26-29 at The Phoenician resort in Scottsdale, Arizona.  This meeting was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

a.    **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

b.    **Defendant Breckenridge**: Larry Lapila, President; Brian Guy, Vice President, Business Development; Martin Schatz, Senior Vice President, Sales;

c.    **Defendant Heritage**: Glazer (then CEO and Chairman);

d.    **Defendant Mylan**: Joe Duda, President; Tony Mauro, President; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Rob O'Neill, Head of Sales;

e.    **Defendant Par**: Jon Holden, Vice President of Sales; Paul Campanelli, President; Renee Kenney, Senior Advisor Generic Sales;

f.    **Defendant Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Allan Oberman, President and CEO Teva Americas Generics; and,

-30-

g.     **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Jim Maahs, Vice President, Commercial Portfolio Management; Mark Evenstad, CEO; Rusty Field, President.

73.    Executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Mylan, Par, Teva, and Upsher-Smith also attended the NACDS 2015 Annual Meeting held on April 25-28 at The Breakers resort in Palm Beach, Florida.

74.    On August 10-13, 2013, the NACDS held its Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada.  The Total Store Expo provides pharmaceutical industry executives with opportunities to meet with each other and to "[f]ollow up on key discussions that were initiated during the NACDS Annual Meeting."  The following of Defendants' representatives, among others, attended the NACDS's 2013 Total Store Expo:

a.     **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

b.     **Defendant Breckenridge**: Larry Lapila, President;

c.     **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Michael Muzetras, Sr. National Accounts Manager; Beth Pannier, Senior National Accounts Manager; Mary Rotunno, National Accounts Manager;

d.     **Defendant Heritage**: Matthew Edelson, Senior Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President), Gina Gramuglia,

Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts;

e.  **Defendant Mylan**: Mike Aigner, Director National Accounts; Kevin McElfresh, Executive Director National Accounts; Joe Duda, President; Robert Potter, Senior Vice President North America National Accounts; Rob O'Neill, Head of Sales; Lance Wyatt, Director National Accounts;

f.  **Defendant Par**: Jon Holden, Vice President of Sales; Renee Kenney, Senior Advisor Generic Sales; Karen O'Connor, Vice President National Accounts; Lori Minnihan, Manager, Pricing & Analytics; Warren Pefley, Director, National Accounts; Charles "Trey" Propst, Vice President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager; and,

g.  **Defendant Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Allan Oberman, President and CEO Teva Americas Generics..

75.    Executives, senior management, and salespeople from Defendants Actavis, Breckenridge, Heritage, Mylan, Par, Teva, and Upsher-Smith attended the NACDS Total Store Expo on August 23-26, 2014, at the Boston Convention Center in Massachusetts, as well as the Total Store Expo on August 22-25, 2015 at the Colorado Convention Center in Denver.

76.    On December 3, 2013, NACDS held its 2013 NYC Week and annual foundation dinner in New York City, which was attended by the following representatives from Defendants:

-32-

a.    **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts);

b.    **Defendant Mylan**: Joe Duda, President; Tony Mauro, COO; Robert Potter, Senior Vice President North America National Accounts; Rob O'Neill, Head of Sales;

c.    **Defendant Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; and,

d.    **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Jim Maahs, Vice President, Commercial Portfolio Management; Mike McBride, Vice President Partner Relations.

77.    At the August 23-26, 2014 NACDS Total Store Expo at the Boston Convention Center, the following representatives from Defendants, key executives for generic drug pricing and sales, attended:

a.    **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts); Richard Rogerson, Executive Director (Pricing & Business Analytics);

b.    **Defendant Breckenridge**: Larry Lapila, President; Martin Schatz, Senior Vice President, Sales;

c.    **Defendant Heritage**: Heather Beem, National Account Manager, Institutional; Katie Brodowski, Associate Director Institutional Sales; Matthew Edelson, Senior

1339968.9

Director of Sales; Jeffrey A. Glazer (then CEO and Chairman), Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President); Gina Gramuglia, Commercial Operations; Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts;

d.   **Defendant Mylan**: Joe Duda, President Mylan Pharmaceuticals; Robert Potter, Senior Vice President North America National Accounts and Channel Manager;

e.   **Defendant Par**: Jon Holden, Vice President of Sales; Renee Kenney, Senior Advisor Generic Sales; Lori Minnihan, Manager, Pricing & Analytics; Warren Pefley, Director, National Accounts; Charles "Trey" Propst, Vice President, National Accounts; Michael Reiney, Vice President, Sales; Jeremy Tatum, Demand Manager;

f.   **Defendant Teva**: David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Kevin Galowina, Head of Marketing Operations; Jessica Peters, Manager of Corporate Accounts; Nisha Patel, Director of National Accounts; and,

g.   **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts; Jim Maahs, Vice President, Commercial Portfolio Management.

78.   On December 3, 2014, NACDS held its 2014 NYC Week and annual foundation dinner in New York City, which was attended by the following representatives from Actavis, Mylan, and Teva:

-34-

a. **Defendant Actavis**: Andrew Boyer, Senior Vice President (Generic Sales, Marketing, National Accounts); Marc Falkin, Vice President (Marketing, Pricing and Contracts); Brent Saunders, President, CEO and Chairman;

b. **Defendant Mylan**: Mike Aigner, Director National Accounts; Robert Potter, Senior Vice President North America National Accounts and Channel Development; Tony Mauro, COO; and,

c. **Defendant Teva**: Theresa Coward, Senior Director of Sales; David Rekenthaler, Vice President, Sales; Maureen Cavanaugh, Senior Vice President and Chief Operating Officer N.A. Generics; Jessica Peters, Director National Accounts.

79.     In addition to common membership in the GPhA and the NACDS, Defendants are involved in an array of buyer-side industry groups, through which they can share pricing strategies, bid terms, and other competitively sensitive information.  For instance, the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") is a group purchasing organization operated and managed by the State of Minnesota's Department of Administration.  According to its website, "MMCAP member facilities purchase over $1 billion per year and have national account status with all of the major brand name and generic pharmaceutical manufacturers." Several of the Defendants are vendors for the MMCAP.

80.      In 2014, the following Defendant representatives served as vendors for the MMCAP: Mark Blitman, Executive Director of Sales for Government Markets for Actavis; Scott Cohon, National Director of Sales for Breckenridge; Anne Sather, National Account Manager for Heritage; Jan Bell, Director of National Accounts for Mylan; Nick Gerebi, Director of National Accounts for Teva; and Michelle Brassington, Regional Account Manager for Upsher-Smith.

Defendants have a continuing relationship with the MMCAP, and several of these individuals served as vendors again in 2016.

81.    On May 12-15, 2014, MMCAP held its National Member Conference in Bloomington, Minnesota.  MMCAP's 2014 National Member Conference was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

    a. **Defendant Breckenridge**:  Scott Cohon, National Accounts Director;

    b. **Defendant Mylan**: Jan Bell, Director, National Accounts;

    c. **Defendant Teva**: Nick Gerebi, National Account Manager;

    d. **Defendant Upsher-Smith**: Michelle Brassington, Regional Account Manager;

    e. **Defendant Actavis**: Mark Blitman, Executive Director of Sales for Government Markets; and,

    f. **Defendant Heritage**: Anne Sather, Director, National Accounts.

82.    The Health Care Supply Chain Association is a trade association that represents group purchasing organizations, such as the MMCAP.  The Health Care Supply Chain Association hosts events that Defendants attend, at which they have the opportunity to interact with each other and discuss their respective businesses and customers.  For example, executives from both Actavis and Teva participated in the LogiPharma Supply Chain Conference on September 16-18, 2014 in Princeton, New Jersey.

83.    The Health Care Supply Chain Association also hosted the National Pharmacy Forum on February 16-18, 2015, in Tampa, Florida, where the following representatives of Defendants were present:

    a.    **Defendant Actavis:** John Fallon, Executive Director of Sales;

b.    **Defendant Breckenridge:** David Giering, Marketing and Trade Relations

Manager;

c.    **Defendant Mylan:** Lee Rosencrance, District Manager; Martin Wingerter,

Director of National Accounts; Jan Bell, Director of National Accounts; Heather

Paton, VP of Institutional Sales; and Mark Pittenger, Sr. Director of National

Accounts; and,

d.    **Defendant Teva:** Nick Gerebi, Director of National Accounts; Jeff McClard, Sr.

Director of National Accounts; Cam Bivens, Director of National Accounts; and

Brad Bradford, Director of National Accounts.

84.    At the National Pharmacy Forum, speaker topics included: "current pricing and

spending trends"; "a critique of the rationale for high prices offered by manufacturers"; and "the

U.S. pharmaceutical market and the ongoing changes within the pharmaceutical world,"

including "upcoming patent cliffs" and "market trends."

85.    In addition to providing an opportunity to share information about the generic

pharmaceutical business, these trade association events often include social activities such as

theater performances, cocktail parties, and dinners, which allow Defendants' executives to

interact with their competitors privately and outside the traditional business setting.

86.    As a result of their involvement in trade associations such as the GPhA, NACDS,

MMCAP, and Health Care Supply Chain Association, Defendants had ample opportunities to

communicate, signal, and agree to raise the price of propranolol.

87.    As part of its years-long investigation into anticompetitive pricing activities

among generic drug manufacturers, the DOJ is investigating trade associations like the GPhA for

creating opportunities for collusion among different generic manufacturers.  The DOJ has stated

that trade associations are "one potential avenue for facilitating the collusion between salespeople at different generic producers."

88.    The states attorneys general allegations likewise explain that trade shows "provide generic drug manufacturers . . . with ample opportunity to meet, discuss, devise, and implement a host of anticompetitive schemes that unreasonably restrain competition[.]"  The substantial increases in the prices of generic propranolol capsules and tablets began within a few weeks of the February 2013 and February 2015 Annual Meetings.

89.    The States allege that Mylan and other generic drug companies used industry trade shows and customer conferences to collude, including conferences hosted by the NACDS, Healthcare Distributions Management Association ("HDMA," now known as the Healthcare Distribution Alliance), and Efficient Collaborative Retail Marketing ("ECRM"), among others. The States further allege: "At these various conferences and trade shows, sales representatives from many generic drug manufacturers . . . have opportunities to interact with each other and discuss their respective business and customers.  Attendant with many of these conferences and trade shows are organized recreational and social events, such as golf outings, lunches, cocktail parties, dinners, and other scheduled activities that provide further opportunity to meet with competitors outside of the traditional business setting.  Of particular importance here, generic drug manufacturer representatives who attend these functions, . . . use these opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information."

90.    In fact, on June 1-4, 2014, the HDMA held a Business and Leadership Conference ("BLC"), which purports to be the healthcare distribution industry's signature annual conference, at the JW Marriott Desert Ridge in Phoenix, Arizona.  The BLC is exclusive to HDMA member

-38-

companies, and it brings together high-level executives, thought leaders, and influential managers from across the healthcare supply chain to hold strategic business discussions. These meetings provided Defendants opportunities to collude in "one-on-one" meeting areas. The June 1-4, 2014 BLC was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

      a.    **Defendant Upsher-Smith**: Scott Hussey, Senior Vice President, Sales; Jim Maahs, Vice President, Commercial Portfolio Management;

      b.    **Defendant Actavis**: Anthony Giannone, Executive Director, Sales; and,

      c.    **Defendant Mylan**: Richard Issac, Senior Manager, Strategic Accounts; Lance Wyatt, Director, National Accounts.

91.    The June 7-10, 2015 BLC was attended by the following representatives from Defendants, who were key executives for generic drug sales and pricing:

      a.    **Defendant Heritage**: Jeffrey A. Glazer (then CEO and Chairman); Jason T. Malek, SVP (then Senior Vice President, Commercial Operations, and subsequently President); Neal O'Mara, Senior Director, National Accounts; Anne Sather, Senior Director, National Accounts; Matthew Edelson, Associate Director, National Accounts;

      b.    **Defendant Actavis**: Andrew Boyer, Senior Vice President, Generic Sales and Marketing; Marc Falkin, Vice President (Marketing, Pricing and Contracts); Richard Rogerson, Executive Director (Pricing & Business Analytics);

      c.    **Defendant Teva**: Theresa Coward, Senior Director of Sales; Nick Gerebi, Director National Accounts; Nisha Patel, Director of National Accounts; Jessica Peters, Director, National Accounts;

d.    **Defendant Mylan**: Todd Bebout, Vice President - NA Supply Chain Management; Janet Bell, Director, National Accounts; Richard Isaac, Senior Manager, Strategic Accounts; Stephen Krinke, National Account Manager; Robert O'Neill, Head of Sales Generic, NA, Sean Reilly, National Account Manager; John Shane, Trade Relations; Erik Williams, VP NA Pricing & Contracts; Lance Wyatt, Director, National Accounts;

e.    **Defendant Par**: Sandra Bayer, Senior National Account Executive; Warren Pefley, Director, National Accounts; Charles "Trey" Propst, Vice President, National Accounts; Michael Reiney;

f.    **Defendant Breckenridge**: Scott Cohon, National Accounts Director; Philip Goldstein, Director of National Accounts; and,

g.    **Defendant Upsher-Smith**:  JoAnn Gaio, Senior National Account Manager, Trade; Scott Hussey, Senior Vice President, Sales; Brad Leonard, Senior Director, National Accounts.

92.    In 2016, Defendants also met regularly and attended trade association meetings, conferences, and events, including (a) the April 11-14, 2016 MMCAP National Member Conference in Bloomington, Minnesota at the Minneapolis Airport Marriott and (b) the August 19-22, 2016, NACDS 2016 Total Store Expo at the San Diego Convention Center in San Diego, California.

93.    The States also allege that sales representatives of generic drug manufacturers "get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business."  "In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as 'industry

-40-

dinners.'"  "At these industry dinners, one company is usually responsible for paying the dinner for all of the attendees.  The company that pays the bill is generally determined by alphabetical order."  Additionally, a large number of generic drug manufacturers, including several Defendants, are headquartered in close proximity to one another in New Jersey, eastern Pennsylvania, or New York, giving them easier and more frequent opportunities to meet and collude.

94.    As a result of these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity and opportunity often leads to agreements among competitors to fix prices or to allocate a given market so as to avoid competing with one another on price.

95.    Defendants routinely communicate and share information with each other about bids and pricing strategy.  This can include forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that type of information.

96.    Defendants also share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection and rebates.  Generic drug manufacturers use this information from their competitors to negotiate potentially better prices or terms with their customers, which could be to the ultimate detriment of consumers.

**D.    Absent an Anticompetitive Conspiracy, Propranolol Price Increases Would Have Run Contrary to Each Defendant's Self-Interest**

97.    Because propranolol is a commodity product, absent a cartel, it would be expected that any manufacturer who raised the price of the drug would lose customers to manufacturers

who did not raise prices.  As a result, it would not be in any manufacturer's self-interest to raise the price of propranolol unless an agreement existed with other manufacturers to raise prices.

98.    During the Class Periods, the costs of manufacturing propranolol remained stable, as did supply and demand.  And yet, each Defendant raised the prices of propranolol by extraordinary margins.  Absent the existence of a cartel, such price increases would not have been in each Defendant's self-interest.

E.    **Defendants Are Under Civil and Criminal Investigation for Price-Fixing Generic Drugs**

99.    Recent drastic price increases in the generic pharmaceutical industry have triggered several governmental investigations by federal and state antitrust regulators, including the Antitrust Division of the DOJ.  Multiple congressional investigations were also launched.

100.    According to a December 2015 report prepared by the Office of Inspector General for the United States Department of Health and Human Services, the price of nearly one in four of the top 200 generic drugs rose faster than the price of inflation between 2005 and 2014.

101.    In April 2015, the Department of Health and Human Services Inspector General undertook an investigation into the sudden price increases implemented by generic drug manufacturers.

102.    In 2014 testimony before the Subcommittee on Primary Health and Aging, pharmaceutical industry experts testified that generic drug prices were not following traditional pricing patterns and were instead experiencing very substantial increases.

1.    **DOJ Investigation**

103.    Over the past year the DOJ's Antitrust Division has issued subpoenas to a number of generic drug manufacturers including Defendants Actavis, Par, Mylan, and Teva.  On June 21, 2016, Teva received a subpoena from the DOJ seeking documents and other information relating

to the marketing and pricing of certain of Teva's generic products and communications with competitors about such products. Defendant Actavis received a similar subpoena on June 25, 2015. On November 9, 2016, Mylan disclosed in a filing with the U.S. Securities and Exchange Commission ("SEC") that "[o]n September 8, 2016, a subsidiary of Mylan N.V., as well as certain employees and a member of senior management, received subpoenas form the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, propranolol and Verapamil products and any communications with competitors about such products. Related search warrants also were executed." And Par has also disclosed that it received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ concerning two of its products in December 2014.

104.    In addition, the DOJ has brought felony charges against two former senior generic pharmaceutical executives from Defendant Heritage for their roles in conspiracies to fix prices, rig bids, and allocate customers for certain generic drugs. *See United States of America v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States of America v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.). The DOJ alleges that Jeffrey Glazer, former CEO and Chairman of Defendant Heritage, and Jason Malek, former President of Defendant Heritage, conspired to fix prices, rig bids, and allocate customers for two generic drug products, with the conspiracies lasting from April 2013 until at least December 2015 and April 2014 until at least December 2015.

105.    A separate action filed by Heritage against Glazer and Malek details a discussion between the two former executives about selling propranolol at a "high price" in early 2015, which is when the extraordinary price increases for propranolol tablets—the propranolol product

which Heritage sells—began. *See Heritage Pharmaceuticals Inc. v. Jeffrey A. Glazer and Jason T. Malek*, Case No. 16-cv-08483 (D.N.J. Nov. 11, 2016), app. A, n. 95.

106.    Brent Snyder, Deputy Assistant Attorney General for the DOJ, said that "these two executives sought to enrich themselves at the expense of the sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines."

107.    Special Agent in Charge Michael Harpster of the Federal Bureau of Investigation's Philadelphia Division stated: "Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency—and very clearly breaks the law." He continued: "It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs. The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law."

### 2. States Attorneys General Investigations

108.    The Connecticut Attorney General has led its own investigation. In December 2015, Endo, the parent corporation for Defendant Par, received Interrogatories and Subpoenas Duces Tecum from the Connecticut AG requesting information regarding pricing of certain of its generic products. On July 12, 2016, Teva received a subpoena from the Connecticut AG seeking documents and other information relating to potential state antitrust law violations. Defendant Actavis has also received a similar subpoena from the Connecticut AG. Mylan's November 9 filing also disclosed that "[o]n December 21, 2016, the Company received a subpoena and interrogatories from the Connecticut Office of the Attorney General seeking information relating to the marketing, pricing and sale of certain of the Company's generic products . . . and communications with competitors about such products."

-44-

109.    The Connecticut AG's ongoing investigation has thus far resulted in a 20-state complaint charging Defendants Mylan, Teva, and Heritage, and non-Defendants Aurobindo Pharma USA Inc. and Citron Pharma, LLC, with antitrust violations in the markets for two generic drugs.  The complaint states that "the Plaintiff States have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time."  In addition, the complaint lays out Mylan's role in both conspiracies and Mylan's regular communications with other competitors to fix prices as early as 2013.  The States have made clear that the evidence of wrongdoing they have uncovered extend far beyond the defendants and drugs identified in their "initial civil action."  The Attorney General of Connecticut, George C. Jepson, whose office led the States' antitrust investigation, told the New York Times: "We believe that this is just the tip of the iceberg.  I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."

110.    The AG complaint explains that in 2013 and 2014, former Heritage executives Malek and Glazer compiled a large list of generic drugs and instructed employees to contact competitors to reach agreement to increase prices and allocate customers.  Malek was allegedly responsible for contacting Defendants Teva and Mylan and did so with respect to a number of drugs.  Both Malek and Glazer allegedly pushed Heritage employees to communicate with their competitors and obtain agreements to raise prices.

## V.    CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking injunctive and declaratory relief, as well as costs of suit and attorneys' fees, for violations of the Sherman Act, 15 U.S.C. § 1, on behalf of the following two classes  (the "Nationwide Injunctive Relief Classes"):

-45-

a. **"Capsules Injunctive Relief Class":** all natural persons, sole proprietorships, partnerships, limited partnerships, corporations, and other entities, who indirectly purchased, paid and/or reimbursed for generic propranolol capsules from March 2013 through the present (the "Capsules Class Period"), intended for consumption by themselves, their families, or their members, participants, employees or insureds in the United States.  Excluded from the class are governmental entities (except for municipalities with self-funded prescription drug plans), the Defendants, their co-conspirators, along with all of their respective parents, subsidiaries, and/or affiliates, all persons or entities that purchased generic propranolol capsules for purposes of resale or directly from Defendants, "flat co-pay" consumers whose co-payment for generic propranolol remained constant regardless of the price increases herein alleged, and any and all jurors, judges, and justices assigned to hear any aspect of this litigation; and,

b. **"Tablets Injunctive Relief Class":** all natural persons, sole proprietorships, partnerships, limited partnerships, corporations, and other entities, who indirectly purchased, paid and/or reimbursed for generic propranolol tablets from December 2014 through the present (the "Tablets Class Period"), intended for consumption by themselves, their families, or their members, participants, employees or insureds in the United States.  Excluded from the class are governmental entities (except for municipalities with self-funded prescription drug plans), the Defendants, their co-conspirators, along with all of their respective parents, subsidiaries, and/or affiliates, all persons or entities that purchased generic propranolol tablets for purposes of resale or directly from Defendants, "flat co-pay" consumers whose co-payment for generic propranolol remained constant regardless of the price increases herein alleged, and any and all jurors, judges, and justices assigned to hear any aspect of this litigation.

112.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking injunctive and declaratory relief, costs of suit and attorneys' fees, and damages, on behalf of themselves and class members residing in states that provide a damages remedy for indirect purchasers (the "Indirect Purchaser States"[4]), on behalf of the following two classes (the "Damages Classes"):

a. **"Capsules Damages Class":**  all natural persons, sole proprietorships, partnerships, limited partnerships, corporations, and other entities, who indirectly

---

[4] The "Indirect Purchaser States" are states that provide for a damages remedy for indirect purchasers under state antitrust laws: Alabama, Arkansas, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Missouri, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

purchased, paid and/or reimbursed for generic propranolol capsules and/or tablets from March 2013 through the present (the "Capsules Class Period"), intended for consumption by themselves, their families, or their members, participants, employees or insureds in the Indirect Purchaser States. Excluded from the class are governmental entities (except for municipalities with self-funded prescription drug plans), the Defendants, their co-conspirators, along with all of their respective parents, subsidiaries, and/or affiliates, all persons or entities that purchased generic propranolol capsules for purposes of resale or directly from Defendants, "flat co-pay" consumers whose co-payment for generic propranolol remained constant regardless of the price increases herein alleged, and any and all jurors, judges, and justices assigned to hear any aspect of this litigation; and,

b. **"Tablets Damages Class":** all natural persons, sole proprietorships, partnerships, limited partnerships, corporations, and other entities, who indirectly purchased, paid and/or reimbursed for generic propranolol tablets from December 2014 through the present (the "Tablets Class Period"), intended for consumption by themselves, their families, or their members, participants, employees or insureds in the Indirect Purchaser States. Excluded from the class are governmental entities (except for municipalities with self-funded prescription drug plans), the Defendants, their co-conspirators, along with all of their respective parents, subsidiaries, and/or affiliates, all persons or entities that purchased generic propranolol tablets for purposes of resale or directly from Defendants, "flat co-pay" consumers whose co-payment for generic propranolol remained constant regardless of the price increases herein alleged, and any and all jurors, judges, and justices assigned to hear any aspect of this litigation.

113.    The Nationwide Injunctive Relief Classes and the Damages Classes are collectively referred to herein as the "Classes" unless otherwise indicated.

114.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least hundreds of thousands of members in each Class.

115.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of generic propranolol sold in the United States;

-47-

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)    Whether the alleged conspiracy violated state laws, as alleged in the Second through Fourth Claims for Relief;

(f)    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(g)    The effect of the alleged conspiracy on the prices of generic propranolol sold in the United States during the Class Periods;

(h)    The appropriate injunctive and related equitable relief for the Nationwide Injunctive Relief Classes; and

(i)    The appropriate class-wide measure of damages for the Damages Classes.

116.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially-inflated prices for generic propranolol purchased indirectly from Defendants.

117.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust, consumer protection, and class action litigation.

118.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

119.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

120.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

<u>**FIRST CLAIM FOR RELIEF**</u>

**VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(On Behalf of Plaintiffs and the Nationwide Injunctive Relief Class Against All Defendants)**

121.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

122.    Beginning as early as 2013 and continuing through the present, the exact starting date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their unnamed co-conspirators entered into a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of the Sherman Act (15 U.S.C. § 1).

123.    In particular, Defendants have combined and conspired to raise, fix, maintain, or stabilize the price of generic propranolol.

124.    As a result of Defendants' unlawful conduct, prices for generic propranolol were raised, fixed, maintained, and stabilized in the United States.

125.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

126.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including but not limited to:  (1) agreeing to raise, fix, and maintain prices for generic propranolol; (2) raising, fixing, and maintaining prices for generic propranolol; and (3) selling generic propranolol throughout the United States at inflated prices.

127.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Nationwide Injunctive Relief Class who purchased generic propranolol have been injured in that they have paid more for generic propranolol than they otherwise would have paid in the absence of Defendants' unlawful conduct.

128.    Defendants' alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

129.    Defendants' unlawful conduct is continuing and will continue unless enjoined by this Court.

130.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Injunctive Relief Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

1339968.9

## SECOND CLAIM FOR RELIEF

### VIOLATION OF STATE ANTITRUST LAWS
**(On Behalf of Plaintiffs and the Damages Class Against All Defendants)**

131.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

132.    During the Class Periods, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of generic propranolol in unreasonable restraint of trade and in violation of the following state statues.

133.    <u>Alabama</u>:  By reason of the foregoing, Defendants have violated Alabama Code § 6-5-60.  Plaintiffs on behalf of the Damages Class allege as follows:

   a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Alabama; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Alabama; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

   b.    During the Class Periods, Defendants' illegal conduct substantially affected Alabama commerce.

   c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

   d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Alabama Code § 6-5-60.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60.

134. <u>Arizona</u>: By reason of the foregoing, Defendants have violated Arizona Revised Statutes, §§ 44-1401, *et seq*. Plaintiffs on behalf of the Damages Class allege as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Arizona; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b. During the Class Periods, Defendants' illegal conduct substantially affected Arizona commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Arizona Revised Statutes, §§ 44-1401, *et seq*.

135. <u>Arkansas</u>: By reason of the foregoing, Defendants have violated Arkansas Code Annotated, § 4-88-107(a)(10). Plaintiffs on behalf of the Damages Class allege as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Arkansas; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and members of the Damages Class

-52-

were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

Class paid supra-competitive, artificially-inflated prices for generic propranolol.

        b.      During the Class Period, Defendants' illegal conduct substantially affected

Arkansas commerce.

        c.      As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

       136.    By reason of the foregoing, Defendants entered into agreements in restraint of

trade in violation of Arkansas Code Annotated, § 4-88-107(a)(10).  Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Arkansas Code

Annotated, § 4-88-107(a)(10).

       137.    <u>California</u>:  By reason of the foregoing, Defendants have violated California

Business and Professions Code, §§ 16700, *et seq.*  Plaintiffs on behalf of the Damages Class

allege as follows:

        a.      Defendants' contract, combination, trust or conspiracy was entered in,

carried out, effectuated and perfected mainly within the State of California, and Defendants'

conduct within California injured all members of the class throughout the United States.

Therefore, this claim for relief under California law is brought on behalf of the Damages Class.

        b.      Beginning at a time currently unknown to Plaintiffs, but at least as early as

2013, and continuing through the present, Defendants and their co-conspirators entered into and

engaged in a continuing unlawful trust in restraint of the trade and commerce described above in

violation California Business and Professions Code § 16720.  Defendants, and each of them,

have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic propranolol at supra-competitive levels.

c.    The aforesaid violations of California Business and Professions Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic propranolol.

d.    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not in any way limited to the acts, practices and course of conduct set forth above and fixing, raising, stabilizing, and pegging the price of generic propranolol.

e.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of generic propranolol has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic propranolol have been fixed, raised, stabilized, and pegged at artificially high, noncompetitive levels in the State of California; and (3) those who purchased generic propranolol directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

f.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the Damages Class have been injured in their business and property in that they paid more for generic propranolol than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of California Business and Professions Code § 16720, Plaintiffs and the Damages Class seek treble damages

and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

138.    <u>District of Columbia</u>:  By reason of the foregoing, Defendants have violated District of Columbia Code, §§ 28-4501, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic propranolol that was shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic propranolol that was shipped by Defendants or their co-conspirators, paid supra-competitive, artificially-inflated prices for generic propranolol, including in the District of Columbia.

b.    During the Class Periods, Defendants' illegal conduct substantially affected District of Columbia commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of District of Columbia Code, §§ 28-4501, *et seq.*  Accordingly,

1339968.9

Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code, §§ 28-4501, *et seq*.

139.    <u>Florida</u>: By reason of the foregoing, Defendants have violated Florida Statutes, § 542.18. Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Florida; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class, including those who resided in Florida and/or purchased generic propranolol that was shipped by Defendants or their co-conspirators, were deprived of free and open competition, including in Florida; and (4) Plaintiffs and members of the Damages Class, including those who resided in Florida and/or purchased generic propranolol that was shipped by Defendants or their co-conspirators, paid supra-competitive, artificially-inflated prices for generic propranolol, including in Florida.

b.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

140.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Florida Statutes, § 542.18. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Florida Statutes, § 542.18.

-56-

141.    <u>Hawaii</u>:  By reason of the foregoing, Defendants have violated Hawaii Revised Statutes, §§ 480-1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Hawaii; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Hawaii commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Hawaii Revised Statutes, §§ 480-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes, §§ 480-1, *et seq*.

142.    <u>Illinois</u>:  By reason of the foregoing, Defendants have violated the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Illinois; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at

-57-

artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Illinois commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

143.    <u>Iowa</u>:  By reason of the foregoing, Defendants have violated Iowa Code, §§ 553.1, *et seq.* Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Iowa; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Iowa commerce.

1339968.9

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Iowa Code, §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code, §§ 553.1, *et seq.*

144.    <u>Kansas</u>:  By reason of the foregoing, Defendants have violated Kansas Statutes, §§ 50-101, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Kansas; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.      During the Class Periods, Defendants' illegal conduct substantially affected Kansas commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Kansas Statutes, §§ 50-101, *et seq.*  Accordingly, Plaintiffs and

-59-

members of the Damages Class seek all forms of relief available under Kansas Statutes, §§ 50-101, *et seq*.

145.    <u>Maine</u>:  By reason of the foregoing, Defendants have violated Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Maine; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Maine commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*.

146.    <u>Michigan</u>:  By reason of the foregoing, Defendants have violated Michigan Compiled Laws, §§ 445.771, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

-60-

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Michigan; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Michigan commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Michigan Compiled Laws, §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Michigan Compiled Laws, §§ 445.771, *et seq.*

147.    <u>Minnesota</u>:  By reason of the foregoing, Defendants have violated Minnesota Statutes, §§ 325D.49, *et seq.* Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Minnesota; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Minnesota commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Minnesota Statutes, §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Minnesota Statutes, §§ 325D.49, *et seq*.

148.    <u>Mississippi</u>:  By reason of the foregoing, Defendants have violated Mississippi Code, §§ 75-21-1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Mississippi; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Mississippi commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Mississippi Code, §§ 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Mississippi Code, §§ 75-21-1, *et seq.*

149.    <u>Missouri</u>:  By reason of the foregoing, Defendants have violated Missouri Revised Statutes, § 416.031(1).  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Missouri; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.      During the Class Period, Defendants' illegal conduct substantially affected Missouri commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

150.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Missouri Revised Statutes, § 416.031(1).  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Missouri Revised Statutes, § 416.031(1).

151.    <u>Nebraska</u>:  By reason of the foregoing, Defendants have violated Nebraska Revised Statutes, §§ 59-801, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.        Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Nebraska; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.        During the Class Periods, Defendants' illegal conduct substantially affected Nebraska commerce.

c.        As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.        By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Nebraska Revised Statutes, §§ 59-801, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Nebraska Revised Statutes, §§ 59-801, *et seq*.

152.    <u>Nevada</u>:  By reason of the foregoing, Defendants have violated Nevada Revised Statutes, §§ 598A.010, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.        Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Nevada; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.       During the Class Periods, Defendants' illegal conduct substantially affected Nevada commerce.

c.       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.       By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Nevada Revised Statutes, §§ 598A.010, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Nevada Revised Statutes, §§ 598A.010, *et seq.*

153.    <u>New Hampshire</u>:  By reason of the foregoing, Defendants have violated New Hampshire Revised Statutes, §§ 356:1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.       Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout New Hampshire; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.       During the Class Periods, Defendants' illegal conduct substantially affected New Hampshire commerce.

c.       As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

1339968.9

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes, §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under New Hampshire Revised Statutes, §§ 356:1, *et seq.*

154.    <u>New Mexico</u>:  By reason of the foregoing, Defendants have violated New Mexico Statutes, §§ 57-1-1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout New Mexico; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.      During the Class Periods, Defendants' illegal conduct substantially affected New Mexico commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of New Mexico Statutes, §§ 57-1-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under New Mexico Statutes, §§ 57-1-1, *et seq.*

155.    <u>New York</u>:  By reason of the foregoing, Defendants have violated New York General Business Laws, §§ 340, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.        Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout New York; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.        During the Class Periods, Defendants' illegal conduct substantially affected New York commerce.

c.        As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.        By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of New York General Business Laws, §§ 340, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under New York General Business Laws, §§ 340, *et seq.*

156.    <u>North Carolina</u>:  By reason of the foregoing, Defendants have violated North Carolina General Statutes, §§ 75-1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.        Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout North

Carolina; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.      During the Class Periods, Defendants' illegal conduct substantially affected North Carolina commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of North Carolina General Statutes, §§ 75-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under North Carolina General Statutes, §§ 75-1, *et seq.*

157.    <u>North Dakota</u>:  By reason of the foregoing, Defendants have violated North Dakota Century Code, §§ 51-08.1-01, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout North Dakota; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

-68-

b.      During the Class Periods, Defendants' illegal conduct substantially affected North Dakota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of North Dakota Century Code, §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under North Dakota Century Code, §§ 51-08.1-01, *et seq.*

158.    <u>Oregon</u>:  By reason of the foregoing, Defendants have violated Oregon Revised Statutes, §§ 646.705, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Oregon; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.      During the Class Periods, Defendants' illegal conduct substantially affected Oregon commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

1339968.9

d. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Oregon Revised Statutes, §§ 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Oregon Revised Statutes, §§ 646.705, *et seq*.

159. <u>Rhode Island</u>: By reason of the foregoing, Defendants have violated Rhode Island General Laws, §§ 6-36-1, *et seq*. Plaintiffs on behalf of the Damages Class allege as follows:

a. Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Rhode Island; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b. During the Class Periods, Defendants' illegal conduct substantially affected Rhode Island commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Rhode Island General Laws, § 6-36-4. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Rhode Island General Laws, § 6-36-11 for overcharges incurred on or after July 15, 2013.

160.  <u>South Dakota</u>:  By reason of the foregoing, Defendants have violated South Dakota Codified Laws, §§ 37-1-3.1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout South Dakota; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.      During the Class Periods, Defendants' illegal conduct substantially affected South Dakota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of South Dakota Codified Laws, §§ 37-1-3.1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under South Dakota Codified Laws, §§ 37-1-3.1, *et seq*.

161.  <u>Tennessee</u>:  By reason of the foregoing, Defendants have violated Tennessee Code, §§ 47-25-101, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at

-71-

artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Tennessee commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Tennessee Code, §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Tennessee Code, §§ 47-25-101, *et seq.*

162.    Utah:  By reason of the foregoing, Defendants have violated Utah Code, §§ 76-10-3101, *et seq.* Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Utah; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Utah commerce.

-72-

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Utah Code, §§ 76-10-3101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Utah Code, §§ 76-10-3101, *et seq.*

163.    <u>Vermont</u>:  By reason of the foregoing, Defendants have violated Vermont Statutes, 9 V.S. §§ 2453, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Vermont; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.      During the Class Periods, Defendants' illegal conduct substantially affected Vermont commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Vermont Statutes, 9 V.S. §§ 2453, *et seq.*  Accordingly, Plaintiffs

-73-

and members of the Damages Class seek all forms of relief available under Vermont Statutes, 9 V.S. §§ 2453, *et seq.*

164.    <u>West Virginia</u>:  By reason of the foregoing, Defendants have violated West Virginia Code, §§ 47-18-1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout West Virginia; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected West Virginia commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of West Virginia Code, §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under West Virginia Code, §§ 47-18-1, *et seq.*

165.    <u>Wisconsin</u>:  By reason of the foregoing, Defendants have violated Wisconsin Statutes, §§ 133.01*, et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' combination or conspiracy had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout

-74-

Wisconsin; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected Wisconsin commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Wisconsin Statutes, §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Wisconsin Statutes, §§ 133.01, *et seq.*

## THIRD CLAIM FOR RELIEF

### VIOLATION OF STATE CONSUMER PROTECTION STATUTES
**(On Behalf of Plaintiffs and the Damages Class Against All Defendants)**

166.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

167.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

168.    Arkansas:  By reason of the foregoing, Defendants have violated the Arkansas Deceptive Trade Practices Act, Arkansas Code, §§ 4-88-101, *et. seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

-75-

a.    Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic propranolol was sold, distributed, or obtained in Arkansas, and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  This conduct on the part of the Defendants constituted "deceptive" and "unconscionable" acts or practices in violation of Arkansas Code, § 4-88-107(a)(10).  Defendants' conduct is unjust, oppressive, indecent, unreasonable, and in violation of public policy in that it unfairly benefits Defendants at the expense of members of the Damages Class that are forced to pay supracompetitive prices for propranolol.

b.    Defendants' unlawful conduct had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Arkansas; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

c.    During the Class Periods, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

e.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code, §§ 4-88-101, *et. seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

169.    <u>California</u>:  By reason of the foregoing, Defendants have violated California's Unfair Competition Law, California Business and Professions Code, §§ 17200, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants committed acts of unfair competition, as defined by Section 17200, *et seq*., by engaging in a conspiracy to fix and stabilize the price of generic propranolol as described above.

b.    The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of Section 17200, *et seq*., including, but not limited to:  (1) violations of Section 1 of the Sherman Act, as set forth above; and (2) violations of the Cartwright Act, California Business and Professions Code, §§ 16720, *et seq*., as set forth above.

c.    Defendants' acts, omissions, misrepresentations, practices and nondisclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act.

d.    Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq*.

e.    Defendants' conduct was carried out, effectuated, and perfected within the State of California.  Defendants maintained offices in California where their employees engaged in communications, meetings, and other activities in furtherance of Defendants' conspiracy.

f.    By reason of the foregoing, Plaintiffs and the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and

benefits that may have been obtained by Defendants as result of such business acts and practices described above.

g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of California Business and Professions Code, §§ 17200, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

170.    <u>District of Columbia:</u>  By reason of the foregoing, Defendants have violated the District of Columbia Consumer Protection Procedures Act, District of Columbia Code, §§ 28-3901, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic propranolol was sold, distributed, or obtained in the District of Columbia.  Defendants took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  This conduct on the part of the Defendants constituted "unlawful trade practices" in violation of District of Columbia Code, § 28-3904.

b.    Defendants and their co-conspirators possessed the sole power to set prices of generic propranolol, and used this power to conceal their price-fixing conspiracy from Plaintiffs and members of the Damages Class.  Plaintiffs and members of the Damages Class were therefore unaware that they were being unfairly and illegally overcharged for generic propranolol.  Defendants' conduct was unconscionable because they used their power to set prices at the expense of Plaintiffs and the public.

c.    Defendants' unlawful conduct had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices for generic propranolol were raised, fixed, maintained, and

stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages

Class paid supra-competitive, artificially-inflated prices for generic propranolol.

   d. During the Class Periods, Defendants' illegal conduct substantially

affected District of Columbia commerce and consumers.

   e. As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and the Damages Class have been injured and are threatened with further injury.

   f. Defendants have engaged in unfair competition or unfair or deceptive

acts or practices in violation of District of Columbia Code, §§ 28-3901, *et seq.*, and,

accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

   171. <u>Florida:</u>  By reason of the foregoing, Defendants have violated the Florida

Deceptive and Unfair Trade Practices Act, Florida Statues, §§ 501.201, *et seq*.  Plaintiffs on

behalf of the Damages Class allege as follows:

   a. Defendants' unlawful conduct had the following effects: (1) price

competition for generic propranolol was restrained, suppressed, and eliminated throughout

Florida; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at

artificially high levels throughout Florida; (3) Plaintiffs and the Damages Class were deprived

of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive,

artificially-inflated prices for generic propranolol.

   b. During the Class Periods, Defendants' illegal conduct substantially

affected Florida commerce and consumers.

   c. As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Statutes, §§ 501.201, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

172.    <u>Hawaii:</u>  By reason of the foregoing, Defendants have violated Hawaii Revised Statutes, § 480-2.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants' unlawful conduct had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Hawaii; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.      During the Class Periods, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Revised Statutes, § 480-2, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

173.    <u>Missouri:</u>  By reason of the foregoing, Defendants have violated Missouri's Merchandising Practices Act, Missouri Revised Statutes, § 407.010, *et. seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Plaintiffs and members of the Damages Class purchased generic propranolol for personal or family purposes.

-80-

b.      Defendants engaged in the conduct described herein in connection with the sale of generic propranolol in trade or commerce in a market that includes Missouri.

c.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic propranolol was sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

d.      Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and the members of the Damages Class concerning Defendants' unlawful activities and artificially-inflated prices for generic propranolol.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of generic propranolol that they purchased.

e.      Defendants misrepresented the real cause of price increases and/or the absence of price reductions in generic propranolol by making public statements that were not in accord with the facts.

f.      Defendants' statements and conduct concerning the price of generic propranolol were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing generic propranolol at prices established by a free and fair market.  Defendants' unlawful conduct had the following effects: (1) generic propranolol price competition was restrained, suppressed, and eliminated throughout Missouri; (2) generic propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

g.    The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

h.    As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

i.    Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Missouri Revised Statutes, § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Missouri Revised Statutes, § 407.025, which provides for the relief sought in this count.

174.    <u>Montana:</u>  By reason of the foregoing, Defendants have violated the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Montana Code, §§ 30-14-101, *et seq.* and §§ 30-14-201, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' unlawful conduct had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Montana; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and the Damages Class were deprived

of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.        During the Class Periods, Defendants marketed, sold, or distributed generic propranolol in Montana, and Defendants' illegal conduct substantially affected Montana commerce and consumers.

c.        As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.        Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Montana Code, §§ 30-14-101, *et seq*. and §§ 30-14-201, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

175.     Nebraska:  By reason of the foregoing, Defendants have violated Nebraska's Consumer Protection Act, Nebraska Revised Statues, §§ 59-1601, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.        Defendants' unlawful conduct had the following effects: (1) generic propranolol price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.        During the Class Periods, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

c.        As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

-83-

d.      Defendants' actions and conspiracy have had a substantial impact on the public interests of Nebraska and its residents.

e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska's Consumer Protection Act, Nebraska Revised Statues, §§ 59-1601, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

176.    <u>New Mexico:</u>  By reason of the foregoing, Defendants have violated the New Mexico Unfair Practices Act, New Mexico Statutes, § 57-12-1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic propranolol was sold, distributed, or obtained in New Mexico.  Defendants took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  This conduct on the part of the Defendants constituted "unfair or deceptive trade practices and unconscionable trade practices" in violation of New Mexico Statutes, § 57-12-3.

b.      Defendants and their co-conspirators possessed the sole power to set prices of generic propranolol, and used this power to conceal their price-fixing conspiracy from Plaintiffs and members of the Damages Class.  Defendants took advantage of Plaintiff's and members of the Damages Class' lack of knowledge to a grossly unfair degree, within the meaning of New Mexico Statutes, § 57-12-2(E).

c.      Defendants' unlawful conduct had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout New Mexico; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at

-84-

artificially high levels throughout New Mexico; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

d.    During the Class Periods, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Statutes, § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

177.    New York:  By reason of the foregoing, Defendants have violated New York General Business Laws, § 349, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and noncompetitive levels, the prices at which generic propranolol was sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and the Damages Class.

b.    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of New York General Business Laws, § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

-85-

c.      Defendants made certain statements about generic propranolol that they knew would be seen by New York residents and these statements either omitted material information that rendered the statements they made materially misleading or affirmatively misrepresented the real cause of price increases for generic propranolol.

d.      Defendants' unlawful conduct had the following effects: (1) generic propranolol price competition was restrained, suppressed, and eliminated throughout New York; (2) generic propranolol prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

e.      During the Class Periods, Defendants' illegal conduct substantially affected New York commerce and consumers.

f.      During the Class Periods, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic propranolol in New York.

g.      Plaintiffs and members of the Damages Class seek all relief available pursuant to New York General Business Laws, § 349(h).

178.    <u>North Carolina:</u>  By reason of the foregoing, Defendants have violated North Carolina General Statutes, §§ 75-1.1, *et seq*.  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic propranolol was sold, distributed, or obtained in North Carolina.  Defendants took efforts to conceal their agreements

-86-

from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators possessed the sole power to set prices of generic propranolol, and used this power to conceal their price-fixing conspiracy from Plaintiffs and members of the Damages Class. Plaintiffs and members of the Damages Class were therefore unaware that they were being unfairly and illegally overcharged for generic propranolol.

b.    Defendants' unlawful conduct had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

c.    During the Class Periods, Defendants marketed, sold, or distributed generic propranolol in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

d.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

e.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina General Statutes, §§ 75-1.1, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

179.    <u>Rhode Island:</u>  By reason of the foregoing, Defendants have violated the Rhode Island Deceptive Trade Practices Act, Rhode Island General Laws, §§ 6-13.1-1, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.      Plaintiffs and members of the Damages Class purchased generic propranolol for personal or family purposes.

b.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic propranolol was sold, distributed, or obtained in Rhode Island.  Defendants took efforts to conceal their agreements from Plaintiffs and members of the Damages Class, including through affirmative misrepresentations and omissions of information important to Plaintiffs and members of the Damages Class.

c.      Defendants and their co-conspirators possessed the sole power to set prices of generic propranolol, and used this power to conceal their price-fixing conspiracy from Plaintiffs and members of the Damages Class.  Plaintiffs and members of the Damages Class were therefore unaware that they were being unfairly and illegally overcharged for generic propranolol.

d.      Defendants' unlawful conduct had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Rhode Island; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

e.      During the Class Periods, Defendants' illegal conduct substantially affected Rhode Island commerce and consumers.

f.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island General Laws, §§ 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

180.    <u>South Carolina:</u>  By reason of the foregoing, Defendants have violated the South Carolina Unfair Trade Practices Act, South Carolina Code, §§ 39-5-10, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

a.    Defendants' unlawful conduct had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout South Carolina; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

b.    During the Class Periods, Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of South Carolina Code, §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

181.    <u>Vermont:</u>  By reason of the foregoing, Defendants have violated the Vermont Consumer Protection Act, 9 Vermont Statutes, §§ 2453, *et seq.*  Plaintiffs on behalf of the Damages Class allege as follows:

-89-

a.      Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which generic propranolol was sold, distributed, or obtained in Vermont.  Defendants took efforts to conceal their agreements from Plaintiffs and members of the Damages Class, including through affirmative misrepresentations and omissions of information important to Plaintiffs and members of the Damages Class.

b.      Defendants and their co-conspirators possessed the sole power to set prices of generic propranolol, and used this power to conceal their price-fixing conspiracy from Plaintiffs and members of the Damages Class.  Plaintiffs and members of the Damages Class were therefore unaware that they were being unfairly and illegally overcharged for generic propranolol.

c.      Defendants' unlawful conduct had the following effects: (1) price competition for generic propranolol was restrained, suppressed, and eliminated throughout Vermont; (2) prices for generic propranolol were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially-inflated prices for generic propranolol.

d.      During the Class Periods, Defendants' illegal conduct substantially affected Vermont commerce and consumers.

e.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Damages Class have been injured and are threatened with further injury.

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont Statutes, §§ 2453, *et seq.*, and, accordingly, Plaintiffs and the Damages Class seek all relief available under that statute.

-90-

## FOURTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Damages Class Against All Defendants)

182.    Plaintiff incorporates and realleges, as though fully set forth herein, each of the paragraphs set forth above.

183.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully and artificially-inflated prices for generic propranolol.

184.    Defendants have benefited from their unlawful conduct described above.  It would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs and members of the Damages Class for generic propranolol manufactured by Defendants during the Class Periods.

185.    Plaintiffs and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and members of the Damages Class are therefore entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a *pro rata* basis.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Classes pray for relief as set forth below:

1.    Certification of the action as a class action pursuant to Federal Rule of Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and Plaintiffs' proposed class counsel as Class Counsel;

2.    A declaration that Defendants' conduct constituted:  (1) an unlawful restraint of trade in violation of the federal and state statutes cited herein; (2) unfair competition or unfair,

1339968.9

unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes cited herein; and (3) acts of unjust enrichment;

3.    Restitution and/or damages to members of the Damages Class for their purchases of generic propranolol at inflated prices;

4.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

5.    Pre-judgment and post-judgment interest on such monetary relief;

6.    Equitable relief in the form of restitution and/or disgorgement of all unlawful or illegal profits received by Defendants as a result of the anticompetitive conduct alleged herein;

7.    An injunction against Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

8.    The costs of bringing this suit, including reasonable attorneys' fees; and

9.    All other relief to which Plaintiffs and members of the Classes may be entitled at law or in equity.

## VII.    <u>JURY DEMAND</u>

Plaintiffs hereby request a jury trial on any and all claims so triable.

Dated: February 24, 2017          Respectfully submitted,


By:    */s/ Dean M. Harvey*
     Elizabeth J. Cabraser (pro hac vice)
     Richard M. Heimann (RH 9373)
     Eric B. Fastiff (pro hac vice)
     Brendan P. Glackin (BG 7314)
     Dean M. Harvey (pro hac vice)
     David T. Rudolph (pro hac vice)
     Bruce W. Leppla (BL 6583)
     Michelle A. Lamy (pro hac vice)
     LIEFF CABRASER HEIMANN &
     BERNSTEIN, LLP
     275 Battery Street, 29th Floor
     San Francisco, CA  94111-3339
     Telephone:    (415) 956-1000
     Facsimile:    (415) 956-1008
     Email: ecabraser@lchb.com
     Email: rheimann@lchb.com
     Email: efastiff@lchb.com
     Email: bglackin@lchb.com
     Email: dharvey@lchb.com
     Email: drudolph@lchb.com
     Email: bleppla@lchb.com
     Email: mlamy@lchb.com


     Daniel E. Seltz (DS 0837)
     Annika K. Martin (AM 2972)
     LIEFF CABRASER HEIMANN &
     BERNSTEIN, LLP
     250 Hudson Street, 8th Floor
     New York, NY  10013-1413
     Telephone:    (212) 355-9500
     Facsimile:    (212) 355-9502
     Email: dseltz@lchb.com
     Email: amartin@lchb.com


     *Attorneys for Plaintiff American Federation of*
     *State, County and Municipal Employees District*
     *Council 37 Health & Security Plan and the*
     *proposed Classes*


     Dan Drachler (DD 1526)
     Robert S. Schachter (RS 7243)
     Joseph Lipofsky (JL 0971)

1339968.9

Sona Shah (SS 4712)
ZWERLING SCHACHTER &
ZWERLING, LLP
41 Madison Ave.
New York, NY 10010
Telephone:(212) 223-3900
Facsimile:  (212) 371-5969
Email: ddrachler@zsz.com
Email: rschacter@zsz.com
Email: jlipofsky@zsz.com
Email: sshah@zsz.com

*Attorneys for the proposed Classes*

Audrey A. Browne (AB 1636)
Seth Kennedy
AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES
DISTRICT COUNCIL 37 HEALTH &
SECURITY PLAN
125 Barclay Street, Rm. 313
New York, NY 10007
Telephone: (212) 815-1304
Facsimile (212) 815-1900
Email: abrowne@dc37.net
Email: skennedy@dc37.net

*Attorneys for Plaintiff American Federation of
State, County and Municipal Employees District
Council 37 Health & Security Plan*

 */s/ Daniel C. Girard*
Daniel C. Girard (pro hac vice)
Dena C. Sharp (pro hac vice)
Adam E. Polk (pro hac vice)
Scott M. Grzenczyk (pro hac vice
GIRARD GIBBS LLP
711 Third Ave, 20th Floor
New York, New York 10017
Telephone: (212)798-0136
Facsimile: (212)557-2952
Email: dcg@girardgibbs.com
Email: chc@girardgibbs.com
Email: aep@girardgibbs.com
Email: smg@girardgibbs.com

-94-

601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Peter Safirstein
SAFIRSTEIN METCALF LLP
1250 Broadway, 27th Floor
New York, NY 10001
Telephone: (212) 201-2845
Email: psafirstein@safirsteinmetcalf.com

*Attorneys for Plaintiff Sergeants Benevolent*
*Association Health & Welfare Fund and the*
*proposed Classes*

-95-

## **ATTESTATION STATEMENT**

I, Dean M. Harvey, am the ECF User whose identification and password are being used to file this End-Payor Plaintiffs' Consolidated Amended Complaint, and pursuant to the Southern District of New York's ECF Rules & Instructions 8.5(b), I attest under penalty of perjury that concurrence in this filing has been obtained from counsel.

*/s/ Dean M. Harvey*
Dean M. Harvey